HEARD NOVEMBER TERM, 1875.

## GARVIN *vs.* THE STATE BANK.

"A," a bank in Charleston, South Carolina, wishing to obtain credit for its over drafts on its correspondent, "B," a bank in Liverpool, made an agreement with the agent of "B," by which it pledged a certain amount of bonds of the State as security for any of its over drafts on "B."

In 1861 bills were drawn by "A" on "B," on the faith of its entire credit, cash and marginal, with "B," which were not presented for acceptance till 1864.

In 1863 "B" closed its business relations with "A," and made out its account against "A," showing a balance due, by it to "B," "A" having become insolvent: *Held,* That "B" was entitled to be paid such balance out of the bonds in preference to the holders of the bills drawn in 1861, but that such holders had a lien on the bonds in preference to the general creditors of "A."

BEFORE GRAHAM, J., AT CHARLESTON, SEPTEMBER, 1874.

This was an action by George Garvin against the President and Directors of the State Bank, an insolvent corporation, and others, to settle the affairs of the bank.

Chichester & Co. and Hastie & Co., A. McLoy and H. M. Banner, and other liquidators of the Royal Bank of Liverpool, filed their petitions in the cause; they were referred to M. P. O'Connor, Esq., who, on the 22d June, 1874, made his report as follows:

These petitions in the aforementioned main cause were respectively referred to me, to inquire and report upon the matters of law and fact raised therein. From the statements contained in the petitions, which have not been contradicted, and the evidence taken before me, it appears that some time prior to the 15th August, 1861, the State Bank, of Charleston, which then and theretofore conducted with the Royal Bank of Liverpool a business correspondence, opened with the latter a credit for the purpose of dealing in and drawing upon them foreign bills of exchange, according to the custom of merchants.

The State Bank at this time being desirous of securing the privilege to over draw upon the said Royal Bank of Liverpool beyond any existing cash credit with it, entered into an agreement with Mr. Molyneaux, the agent of the Royal Bank on this side, whereby, as a pledge or security for any over drafts, the State Bank were to deposit with Mr. Molyneaux $100,000 State of South Carolina six per cent. bonds. In pursuance of the agreement, the State Bank did deliver to Mr. Molyneaux the $100,000 State bonds, which he first lodged with the Southwestern Railroad Bank, and subsequently had transferred to the vaults and custody of the State Bank. These bonds remained in the custody of the State Bank from the day they were turned over until their seizure and asportation by Federal soldiers, in February, 1865, at Lynch's Creek, near Camden, S. C., to which point they were removed for safety with the other treasure of the bank by its Cashier, Mr. B. A. Lee. Of these bonds, seventeen in number, of the par value of $1,000 each, were recovered by the bank, sold, and the proceeds disbursed by the bank, leaving eighty three, $1,000 each, still unrecovered.

The draft which is the subject of the petition of Chichester & Co., and of Hastie & Co., was drawn by B. M. Lee, Cashier, on the 15th August, 1861, for £500, ninety days after date, without advice; and the draft which is the subject of A. McLoy's petition was drawn on the 11th November, 1861, sixty days after sight, for £600, without advice.

The first of these mentioned drafts was not presented for acceptance until about the 24th July, 1864, and the latter was protested for non-acceptance on the 5th of August, 1864.

The Royal Bank of Liverpool presented their accounts with the State Bank, made up to June 30th, 1863, showing at the date a balance to the debit of the State Bank, on account of over drafts and interest and minor charges, one thousand ninety-three pounds, two shillings and eight pence.

Chichester & Co. and Alexander McLoy have petitioned on behalf of themselves, and all others having like claims who will contribute to the expense and seek to be joined, to have the amounts of their bills out of the one hundred thousand ($100,000) dollars of State bonds pledged to the Royal Bank, or any part of the proceeds of them, in preference to the Royal Bank of Liverpool and the other creditors of the State Bank.

The Royal Bank of Liverpool claims to be first entitled to payment of their account against the State Bank, for its over drafts, in preference of all other claimants; and the general creditors of the State Bank resist, generally, the allowance of any priority to either of the said creditors out of the said bonds, and insist that whatever rights these creditors may at any time have set up to this fund have been now forfeited by their laches.

In order to determine what rights the petitioning creditors have, it is necessary first to ascertain what was the true nature of the agreement made between the State Bank and the Royal Bank of Liverpool, in August, 1861.

The only evidence we have to make out a proper interpretation of the agreement is contained in the testimony given by Mr. Sebring, in conjunction with Mr. Sebring's letter of the 30th August, 1863, and the letter of H. H. Withers, Manager of the Royal Bank of Liverpool, dated the 4th of July, 1863. In harmony with these proofs, I regard the deposit made by the State Bank of the $100,000 of bonds as no more than the pledge of so muc collateral to protect any advances made by the Royal Bank, in honor of the bills of the State Bank, in over draft of the cash credit.

The Royal Bank never meant to open an absolute, irrevocable credit in favor of the State Bank for twenty thousand pounds, for this would be equivalent to the purchase of the Royal Bank of $100,000 of State South Carolina bonds for £20,000, or a loan of this amount upon the faith of these bonds as security. Mr. Withers's (the Manager) letter precludes this idea, and indicates exactly what the Royal Bank agreed and felt bound to do. If these bond collaterals had been transmitted to England and lodged with the Royal Bank, for its own safety, upon reasonable notice it might at any time have put a stop to the open credit, secured itself for any advances out of the collaterals pledged and returned the balance to the State Bank. It is a transaction of frequent occurrence with commercial and banking correspondents, of granting and using marginal credits upon a pledge of security, but such credit is never deemed absolute and irrevocable, but is restrained by the ordinary rules for the security of a creditor. In this case no time was fixed within which the bills should be drawn, so that if the open or original credit was absolute, the over drafts might be drawn at an unlimited distance,

and after the collaterals, by depreciation, had become almost, if not entirely, worthless.

The Royal Bank of Liverpool had no understanding with any party but the State Bank, and there was no privity between it and any of the purchasers of bills from the State Bank. It stood in no binding relation with holders of bills drawn upon it until presentation, nor is it to be presumed to have had notice of what the State Bank had drawn against until such notice is brought home to it, and certainly could not have been advised of the bill for £500 held by Chichester, and that for £600 held by McLoy, since, as stated upon the face of them, they were drawn without advice; nor was the arrangement between the State Bank and the Royal Bank of Liverpool, as to marginal credit, declared and made known to the purchasers of these bills at the time of purchase.

The collaterals lodged were designed as security for no other creditor of the State Bank than the Royal Bank; and these purchasers, in no way known to the Royal Bank, cannot claim to be subrogated to its especial securities, and most assuredly not in exclusion of or in priority to the Royal Bank's indemnity. The Royal Bank was neither a debtor to the State Bank for these bills nor to the holder of them, nor in any way a surety for them in the hands of the holders before acceptance; and the doctrine in *Maure* vs. *Harrison*, (1 Eq. Cas. Abr., 93,) does not apply, nor does *Fogartie* vs. *The Bank*, to be found in 12 Rich., 518, admitting it to be law in spite of the overruling of the doctrine in *Christmas* vs. *Russell*, (14 Wallace, 69,) apply; for in this last case the holder of the check presented it to the Bank and claimed the right to have it paid.

In case of Chichester & Co. and McLoy no demand was made upon the Bank in Liverpool until in the Summer of 1864, long after the bank had closed its accounts and struck the balance due it from the State Bank for over draft.

On the 30th of June, 1863, the Royal Bank closed its account and brought the State Bank their debtor for £953 14s. 6d. If the $100,000 State bonds at the time were in the possession of the Royal Bank, it might have applied enough of them to discharge the balance, and the remaining bonds would have stood to the credit of the State Bank as its property.

I must, therefore, hold that the balance due the Royal Bank, for which these bonds were an original pledge, must be first discharged,

and then arises the next question: What becomes of the balance? Were it not for Mr. Sebring's testimony that he was the bailee of these bonds, for the security of the Royal Bank and all his over drafts, I would feel bound to decide that the two other bill creditors who have petitioned would have no lien upon the special deposit for their payment and would rank them among the general creditors of the bank.

But by Mr. Sebring's own admission, when he drew these bills he drew them upon the faith of his entire credit, cash and marginal, with the Royal Bank, and considered the one hundred thousand dollars ($100,000) deposited with him as collaterals, as well for these as for the acceptances of the Royal Bank; and in equity, I think, the holders of these bills have a prior claim to the general creditors upon these bonds.

I, therefore, in conclusion, report and recommend that out of any proceeds of these bonds in the hands of the Receiver, after the payment of all the costs and expenses of these proceedings, he do pay first the debt due the Royal Bank of Liverpool, then the bills of the two other petitioning creditors equally with the other holders of bills of a similar kind who may come in and establish their claims, and the balance he shall apply equally among all the other creditors of the State Bank.

Chichester & Co. and Hastie & Co. excepted to the report. -

The decree of His Honor the Circuit Judge is as follows :

GRAHAM J. This is a petition of Chichester & Co. and Hastie & Co., in behalf of themselves and others in like condition, *in re* George Garvin against *The State Bank*, and the following is a statement of the petitioners' case :

The State Bank during the war entered into an agreement with the Royal Bank of Liverpool, by which, upon the deposit by the State Bank with the agent of the Royal Bank here of $100,000 State bonds as collaterals, the Royal Bank agreed to allow the State Bank a marginal credit to the amount of £20,000.

The $100,000 State bonds were delivered to Mr. Molyneaux, the agent of the Royal Bank, and were at first deposited by him in the Southwestern Railroad Bank, but afterwards, for his convenience, were placed, as a special deposit by him, in the vaults of the State Bank, where they remained until removed in consequence of the

exigencies of the war, and many of them lost with its treasures near Camden, in 1865. Some of them have been recovered.

Having effected this arrangement, the State Bank continued to draw sterling bills, then in great demand, upon the Royal Bank, and, among others, drew and sold to Hastie, Calhoun & Co., the assignees of the petitioners, the bills they now present.

This bill, it is said, was not intended to be drawn upon the marginal credit, but upon the money in the Royal Bank. But there was no ear mark to distinguish such bills from those drawn on the credit except priority of numbers and dates; and it so happened, in the disorganized condition of communication with Europe, and from other causes arising from the war then going on, some of the after drawn bills reached Liverpool before that held by the petitioners and were paid. Thus the actual money to the credit of the State Bank was exhausted, and bills were paid upon the marginal credit to the amount of £954. —s. —d.

It appears by the testimony of Mr. Sebring, the President of the State Bank, that in his view and intentions only one bill was drawn on the marginal credit, and that, for ten thousand pounds, was sold to the agents of the Confederate government. It was the last drawn, and was paid, being presented before others prior in date and numbers. In short, the Royal Bank paid bills drawn on the credit, out of the actual funds, and then, disregarding the agreement, refused to pay on the marginal credit other bills drawn on funds in bank. But there was no difference in the bills as between the holders, whatever may have been the understanding, if any, between the two banks, and it makes no difference whether the bills were intended to be drawn on money or credit, the Royal Bank was equally bound to pay. The holders had a right to be paid. Both banks are insolvent.

Under the case made by the statements of facts, the question is presented: What application should be made by the State Bank of the bonds which have been recovered or which may come into its possession?

Are they to be regarded as general assets, as the State claims, or are they to be held as a special fund to meet and discharge, in the first place, the trust upon which they were set apart and dedicated?

The petitioners insist upon the latter. They say that when the Royal Bank refused the bills of the State Bank, not exceeding but within the limits of the marginal credit, from that moment the

holders of such dishonored bills had a perfect claim to protection out of the bonds, and if the bonds had been in the actual possession of the Royal Bank it would have been a fraudulent misappropriation to apply them to any other purpose. And, further, that the State Bank, being in possession in the double character as bailee and drawer of the bills, was equally bound to apply these securities to the payment of the dishonored bills if unable to pay them otherwise.

They also say that there is no doctrine better established than that the creditor has a right to the benefit of all indemnity or counter security held by the insolvent debtor. The early case of *Maure* vs. *Harrison* (1 Eq. Cas. Abr., 93,) and an unvarying line of authorities from that time, sustain the doctrine. This case clearly comes within that principle.

The State Bank put up indemnity securities for its over draft upon the Royal Bank and the latter agreed to pay them. It did not pay them and became insolvent. The holders of these bills claim the benefit of the securities dedicated for their protection before the bills were drawn.

In the judgment of the Court the petitioners and others in the same plight, holding sterling unpaid bills of the State Bank within the amount of the marginal credit, whether accepted by the Royal Bank or not, are entitled to the relief they seek. They have an undoubted equity to be paid out of the bonds deposited for the security of the Royal Bank if it had paid, which it was bound to do ; and the application of these bonds by the State Bank to any other purpose would be a misapplication of them ; and if they had been so misapplied, then they must be replaced by or out of other funds of the bank.

The unpaid bills must be paid before the amount due the Royal Bank, and this must be done. It was the duty of the Royal Bank to pay all, and then it would have been entitled first to the collateral securities.

It is ordered and decreed that the exceptions to the report of the Referee filed by the petitioners in this case be sustained, and that the petitioners and others in the like plight are entitled to priority in the payment of their bills out of the proceeds of the said bonds ; and it is ordered that they be so paid. And to that end it is ordered that the Referee do call in the holders of the unpaid bills drawn by the State Bank on the Royal Bank of Liverpool, to prove the

respective amounts outstanding, and that he do report the same. That he also inquire and report how many and what amount of said bonds have been recovered by the State Bank, and when and how disposed of, and for how much, and how the proceeds of sale have been applied; and in the event that the said bonds or the proceeds thereof have been applied to other purposes than the use upon which the banks held them in trust, then that he do also report fully all the property and assets of the State Bank in the hands of the Receiver and elsewhere, to the end that the same, or so much thereof as may be necessary, be applied to the restoration of the trust bonds or the money received for them.

H. M. Banner and others, official liquidators of the Royal Bank of Liverpool, excepted to the decree on the following grounds:

1. That the other petitioners have no lien by way of subrogation on the State bonds, because their bills were not accepted by the Royal Bank; and that if any such lien existed, it is subordinate to that of the Royal Bank.

2. That there was no proof of any dedication, assignment nor setting apart of any fund to the payment of the bills of exchange; and that if there were any such dedication there was no proof of notice of it to the Royal Bank, and that any dedication, assignment or setting apart of the State bonds for such purpose could only be in subordination to the rights of the Royal Bank.

3. That the Royal Bank did no wrong in paying bills presented in the order of their presentation.

4. That the Royal Bank was not bound to accept and pay the petitioner's bills when presented; that even if it was, it is only liable to the State Bank for not doing so, and that in no event is it liable to the forfeiture of its lien in the State bonds, which is the result of the decree.

*Lowndes,* for appellants.

————————, contra.

April 5, 1876. The opinion of the Court was delivered by

WILLARD, A. J. The only question before us comes up on the appeal in behalf of the Royal Bank of Liverpool from the Circuit decree, and involves the right of the petitioners to have their drafts

paid out of the proceeds of the securities in question in preference to the claims of the Royal Bank to such securities. On this question we are satisfied with the conclusions stated and reasons assigned by the Referee in his report, and hold the decree of the Circuit Court reversing such conclusions erroneous.

The securities were taken exclusively for the benefit of the Royal Bank. The deposit in the State Bank was a mere bailment, not inconsistent with a special property in the Royal Bank under the agreement by which they were put in pledge. The place of deposit was optional with the Royal Bank. The proceeds of that portion of the securities recovered must be regarded as standing in the same position as the securities themselves previous to the removal from the place of original deposit. Holders of drafts drawn upon the Royal Bank, at least previous to acceptance, had neither a legal nor equitable claim against nor lien upon this specific fund, nor privity with the agreement between the banks. They could not claim that their drafts were to be regarded as drawn on the faith of such securities under the agreement with the Royal Bank, for that contract did not contemplate transactions of that nature. Even if it had been shown that, as between the drawer and payee, such an understanding existed, it would not affect the rights of the Royal Bank, whose claim to securities was unaffected by any authority in the State Bank to make any such transactions. The right of the State Bank to draw was not absolute, but dependent upon the assent of the Royal Bank. The holders have no better claims, legal or equitable, than the State Bank, and that institution had no authority under the agreement with the Royal Bank to impose any charge or lien on the securities.

It follows that the Royal Bank is entitled to the proceeds of the securities to the extent that may be necessary to satisfy its claim under the original agreement.

*Moses*, C. J., and *Wright*, A. J., concurred.